Locke, Jeffrey A., J.

INTRODUCTION

Plaintiffs, Edriss Farazi (“Farazi”) and Afareen Model Management, Inc. (“Afareen, Inc.,” collectively “the plaintiffs”), filed this complaint alleging: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) tortious interference with contract; (5) interference with advantageous relations; (6) violation of chapter 93A; and (7) intentional infliction of emotional distress against the defendants, Andrew A. Caffey (“Caffey”), Terri Bears (“Bears”), Alex DeFrawey (“DeFrawey”), eModel.com, Inc. (“eModel.com”), Options Talent, Inc. (“Options, Inc.”), Trans Continental Talent, Inc., a/k/a Wilhemina Scouting Network (“TCN”), Trans Continental Entertainment Group (“TCEG’j, John Esposito (“Esposito”), and Blue Moon Model Network, Inc. (“Blue Moon, Inc.,” collectively “the defendants”) based on a dispute over a modeling talent franchise agreement. Presently before this court is Caffey’s Motion to Dismiss pursuant to M.R.C.P. 12(b)(2), for lack of personal jurisdiction. For the reasons set forth below, the Defendant’s Motion to Dismiss is DENIED.

BACKGROUND

Defendant Caffey is a resident of Maryland and an attorney licensed to practice in Maryland and the District of Columbia. eModel.com is a Delaware corporation with a principal place of business in Orlando, Florida. During the course of its existence, eModel.com underwent several name changes. In its first incarnation, eModel.com was renamed Options, Inc. TCN, also known as the Wilhemina Scouting Network, later succeeded Options, Inc. TCEG, is a Nevada corporation and a publicly traded holding company, which allegedly controls and owns the corporate defendants. Caffey served as legal counsel for TCN and its predecessors starting in September 2000. Also, from September 2000 to January 31, 2002, Caffey served on the board of directors for eModel.com. Plaintiff Farazi is a Massachusetts resident who owns and controls Afareen, Inc., a professional Massachusetts corporation with a usual place of business in Worcester.
In February 2001, Farazi responded to an online advertisement for eModel.com, a modeling talent franchise. Shortly after, Farazi received a telephone call from an individual named Terri Bears, eModel.com’s Vice President for Franchise Operations, in Orlando, Florida regarding business opportunities with the company. Farazi expressed interest, asked Bears for the names of franchise owners that he could contact and also inquired about available franchise markets in the areas of Worcester, Lowell, Nashua, Brockton, and Providence. In response, Bears provided Farazi with a list of names and invited him to come and visit eModel.com’s corporate headquarters in Orlando. Bears also informed Farazi that she would be sending him a Uniform Offering Circular (“U.F.O.C.”) and franchise agreement in the mail for him to review. Based on the list of names provided, Farazi contacted John Esposito (“Esposito”), a franchise owner in Quincy, Massachusetts. According to Farazi, he observed that Esposito’s business was operating on the “old system” wherein models were enrolled in person at the franchise center, the same system described in the U.F.O.C. that he received in the mail. The U.F.O.C. listed a $195 fee for each recruited model and a $9.95 monthly maintenance fee for each recruited model’s portfolio.
In March 2001, Farazi traveled to Orlando to meet with Beans, who gave him and other prospective franchisees a presentation about eModel.com’s franchise system. During that meeting, Farazi received an eModel.com booklet containing information about the inner workings of the modeling industiy, the model referral policies, the responsibilities of franchisees, as well as a description of services and support offered to franchisees. The booklet contained descriptions of earnings that franchisees would make based on certain fees.[2]
Based upon the presentation and materials given to him, Farazi decided to purchase an eModel.com franchise in Worcester upon his return to Massachusetts. Prior to his purchase, Farazi negotiated with Caffey, acting as eModel.com’s legal counsel, to include a territorial provision in the franchise agree *498 ment. The territorial provision provides, in relevant part:
Territory Not Exclusive: You acknowledge and agree that the territory is not exclusively reserved for your business. We may locate another model promotion business using the eModel system in your designated territory where we may reasonably determine that the market will support one more additional eModel system offices. Notwithstanding, we shall not locate another such model business if your territory had a population of less than 250,000 and we shall not locate said model business within fifty (50) mües in any direction of the location of your offices. We retain the right to offer and sell eM-odel.com services or branded products through any channel of distribution, including the Internet, using the Marks and the eModel system anywhere inside or outside your territory.
3 C, Territorial Provision, Franchise Agreement (emphasis supplied).
On June 4, 2001, Farazi entered into a franchise agreement with eModel.com and paid a franchise fee of $20,000. On October 11, 2001, Farazi opened his eModel.com franchise in Worcester after expending approximately $27,000 in setup costs. Shortly after, Farazi alleges that eModel implemented its bait-and-switch scheme on him by moving away from the “old system” of fees and towards a new system that charged higher fees for model enrollment, thereby reducing the profitability of his business. By that point, Farazi claims he had already invested nearly $50,000 in setting up his franchise and felt compelled to pursue his investment rather than abandon it.
In June 2001, e.Model.com notified Farazi that it was changing its name to Options Talent, Inc. (“Options”), but did not provide a reason for its name change. On June 4, 2001, Options provided Farazi with a new franchise agreement as part of the corporation’s new name change. Sometime later, on March 5, 2002, Farazi signed and executed another franchise agreement, which changed his eModel.com franchise to an Options franchise.
In September 2002, Options informed Farazi that it was changing its name again, this time to Trans Continental Talent, Inc. (“TCN”). In the fall of 2002, TCN sold a franchise to Esposito in Rhode Island which led to another dispute between Farazi and TCN. Farazi alleged that Esposito’s franchise fell within 50 miles of his own franchise, thereby violating the territorial provision of his franchise agreement and causing a loss of revenues to his own franchise. Farazi complained and protested the sale in a letter dated November 18, 2002 to Bears. On November 22, 2002, Farazi informed Bears of his intent to move back to the “old system.” Subsequently, Bears and Nikki Borreggine, Director of Franchise Operations, and Farazi engaged in a series of email correspondence concerning Farazi’s efforts to move back to the “old system.”
Soon after, Caffey sent Farazi two letters dated December 5, 2002. In the first letter, Caffey asserted that the territorial provision did not apply to Esposito’s Rhode Island franchise because the population in Farazi’s territory exceeded 250,000 people. In the second letter, Caffey stated TCN’s opposition to Farazi’s attempt to revert back to the “old system” and urged him against doing so. The second letter, states, in relevant part:
As we read this contract, it does not allow you to convert to the traditional close arrangement, and certainly not without the written agreement of Trans Continental Talent. This can only be accomplished by an amendment of the contract signed by Trans Continental Talent and you, re-stating this key feature of the business relationship. We are advised that, at this time, Trans Continental Talent has no interest in agreeing to this change. Under your Franchise Agreement, you do not have the unilateral right to convert your office’s method of operation, and we respectfully urge you not to make change you described in your email of November 27.
Caffey Letter, December 5, 2002.
In a letter dated March 5, 2003, Farazi complained that TCN’s questionable actions and business practices were causing harm to him and his business operations. Caffey responded by denying all of Farazi’s claims in another letter dated March 14, 2003. Prior to this letter, TCN underwent another name change, this time to the Wilhemina Scouting Network. TCN provided Farazi with another franchise agreement for the name change, however this time, Farazi refused to agree to the amendment. As a result, TCN terminated Farazi’s franchise. By letter dated April 8, 2003, Caffey informed Farazi that TCN was terminating their franchise agreement. On April 23, 2003, Farazi filed suit against the named defendants in Worcester Superior Court.
The thrust of Farazi’s complaint against Caffey, in his role as corporate director and legal counsel for the corporate defendants, is that Caffey wrongfully induced him into entering into a franchise agreement based upon material misrepresentations and subsequently wrongfully terminated their franchise agreement.[3]

DISCUSSION

I. Standard of Review

A Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction requires the court to construe all the facts in favor of the plaintiff. Tatro v. Manor Care, Inc., 416 Mass. 763 (1994). However, the burden is on the plaintiff to demonstrate sufficient contacts between the nonresident defendant and the forum state, Cepeda v. Kass, 62 Mass.App.Ct. 732, 736 (2004); *499 Foster Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995).
Whether the exercise of jurisdiction over a non-resident defendant is proper generally presents a two-fold inquiry: (1) is the assertion of jurisdiction authorized by the state’s longarm statute, codified at G.L.c. 223A, §3(a)-(h); and (2) if authorized, is the exercise of jurisdiction under state law consistent with basic due process requirements mandated by the United States Constitution. Haddad v. Taylor, 32 Mass.App.Ct. 332, 334 (1992); Tatro, 416 Mass. at 767; Morrill v. Tong, 390 Mass. 120, 129 (1983); Good Hope Indus., Inc., v. Ryder Scott Co., 378 Mass. 1, 6 (1979); Beaulieu v. Beaulieu, 46 Mass.App.Ct. 850, 851 (1999). The two questions may converge since G.L.c. 223A “functions as ‘an assertion of jurisdiction’ over the person to the limits allowed by the Constitution of the United States.” Good Hope Indus., Inc., 378 Mass. 6, quoting Automatic Sprinkler Corp. of America v. Seneca Foods Corp., 361 Mass. 441, 443 (1972). In analyzing the jurisdictional claim, the court takes the evidence set forth by Farazi as “true (whether or not disputed) and constructs] it in the light most congenial” to Farazi’s claims. See Daynard v. Motley, 290 F.3d 42, 45 (1st Cir. 2002). At this stage in the proceedings, it is not for the court to resolve disputed facts. Id.

II. The Longarm Statute

At the outset, the defendant’s conduct must fall within the literal terms of the longarm statute. Before reaching constitutional due process concerns, the court must determine whether the plaintiff has set forth facts establishing some basis for jurisdiction enumerated in the statute. Telco Communications, Inc. v. New Jersey State Fireman’s Mutual Benevolent Assoc., 41 Mass.App.Ct. 225, 230 (1996). The court must decline jurisdiction if at least one of the statutoiy grounds is not met. Good Hope Indus., Inc., 378 Mass. at 6; Burtner v. Burnham, 12 Mass.App.Ct. 158, 161 (1982). This court first addresses the statutoiy inquiry. The subsections relied upon by Farazi, provides in relevant part:
A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person’s: (a) transacting any business in this Commonwealth; (b) contracting to supply services or things in the Commonwealth; (c) causing tortious injuiy by an act or omission in this Commonwealth; (d) causing tortious injuiy in this Commonwealth by an act or omission outside the Commonwealth if he regularly does or solicits business, or engages in a persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth . . .
G.L.c. 223A, §3(a)-(d).
Caffey disputes the applicability of subsection (b) and (c) to the fact of this case. In his motion, Caffey maintains that G.L.c. 223A, §§3(a) and (d) are the only possible bases for long-arm jurisdiction in this case, of which he contends Farazi had failed to allege sufficient facts to support a finding of personal jurisdiction.

A. G.L.c. 223A, §3(a): Transacting Business in Massachusetts

With respect to G.L.c. 223A, §3(a), personal jurisdiction can be asserted if the defendant or its agent transacted any business in the Commonwealth, and if the cause of action arose from that business. Good Hope Indus., Inc., 378 Mass. at 6. Whether a particular defendant’s acts constitute transacting any business must be decided on the particular facts of the case. Morrill v. Tong, 390 Mass. 120, 129 (1983); Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 156-57 (1978). While jurisdiction over a corporation does not automatically confer jurisdiction over its officers, “active entrepreneurial or managerial conduct" in a State will cause jurisdiction to attach. Kleinerman v. Morse, 26 Mass.App.Ct. 819, 824 (1989) (citation omitted); see also Marks v. Polaroid Corp., 237 F.2d 428, 435 (1st Cir. 1956) (corporate officer who supervised and directed day-to-day operations could properly be charged as having directly contributed to violations alleged against corporate defendants); Johnson Creative Arts, Inc. v. Wool Masters, Inc., 573 F.Sup. 1106, 1111 (D.Mass. 1983) (personal jurisdiction over president who planned the incorporation, composed and mailed the solicitation letter, and received telephone orders from Massachusetts retailers); Commonwealth v. Colonial Motor Sales, Inc., 11 Mass.App.Ct. 800, 812-13, n.12 (1981) (a corporate officer “cannot evade responsibility by insulating himself with a layer of ignorance”); Tufts Electronics Grouping v. Alfarano, 1998 WL 1284182 (Gants, J.) (finding personal jurisdiction over individual officers of New York corporation who attended meetings in Massachusetts with plaintiff and entered into dispute resolution agreement regarding corporation’s accounts payable).
The “transacting business” requirement has been construed broadly to reach any purposeful acts by an individual, whether personal, private or commercial. See Ross v. Ross, 371 Mass. 439, 441 (1976); Johnson v. Witkowski, 30 Mass.App.Ct. 697, 713 (1991). The statutory requirement for jurisdiction under §3(a) may be met where the only contact involved is an isolated transaction or one with little impact on the commerce within the Commonwealth. Buckeye Associates v. Fila Sports, Inc., 515 F.Sup. 1484 (D.Mass. 1985). Thus, a defendant with veiy slight contact with Massachusetts may be viewed literally as having “transacted business” in Massachusetts even though such contact may be constitutionally insufficient to support jurisdiction. Good Hope Indus., Inc., 378 Mass. at 8.

1. Activities of the Corporate Defendants and Caffey

In the present case, the activities of the corporate defendants constitute the transaction of business in Massachusetts because these activities created ongo *500 ing business relationships with their franchisees in the Commonwealth, which required continuous monitoring of, communication and negotiation with these franchisees. In addition, the corporate defendants placed advertisements that intended to reach potential Massachusetts franchisees throughout the entire relevant period. All of these activities were extensive, not mere isolated incidents and, therefore, are sufficient to satisfy the requirements of §3(a). Compare Howse v. Zimmer Mfg., Inc., 757 F.2d 448 (1st Cir. 1985).
The issue presented is whether the activities conducted by Caffey, as an agent of the various named corporate defendants, are sufficient to confer personal jurisdiction. Caffey argues that activities on behalf of the corporate defendants do not constitute the transaction of business because he acted as an agent on behalf of a corporation, rather than in his individual capacity.[4] Acting as legal counsel for the corporate defendants, Caffey negotiated with Farazi the terms of the initial franchise agreement, drafted and sent three letters, two of them dated December 5, 2002 and one dated April 8, 2003 to Farazi in Massachusetts in response to his correspondence regarding their franchise agreement. Caffey contends that these actions alone are insufficient to constitute the transaction of business, particularly given his claims that he has never advertised in Massachusetts, has never solicited clients in Massachusetts, and is neither a member of the Massachusetts bar nor ever practiced in any court in Massachusetts. However, additional allegations made by Farazi suggest that Caffey’s role in the various named corporations went beyond that of legal counsel. Specifically, Farazi alleges that Caffey, in addition to his role as legal counsel, also acted as the corporate director of the now bankrupt corporate defendants. However, Farazi claims that the limited discovery that has taken place to date has impeded his ability to ascertain the full extent of Caffey’s involvement in the activities of the corporations in his capacity as director and legal counsel. This court agrees with Farazi’s assertion concerning discovery in this case.
Even assuming, arguendo, that Caffey transacted business in the Commonwealth, Farazi then must show that his claims “arose from” Caffey’s transaction of business. Tatro, 416 Mass. at 767. In order to make such a determination, courts employ the “but for test.” Id. at 769-71. In other words, Farazi must demonstrate that but for Caffey’s business transactions, his claims would not have arisen. Id. Here, Farazi’s cause of action is based on material misrepresentations made by the named defendants including Caffey, which induced him to purchase a franchise. His cause of action also arises from the wrongful termination of this franchise, which occurred by means of a letter Caffey wrote and sent to Farazi. Further, Caffey’s status as director of the corporate defendants between September 2000 and January 2002 is important and lends further credence to Farazi’s jurisdictional argument. Contrary to Caffey’s assertion, portions of Farazi’s claims arose prior to Caffey’s departure from the board.
Based on the limited discovery disclosures available, Caffey admitted that he had participated in the drafting of operative documents for the corporate defendants, including (1) the advertising brochure issued to Farazi; (2) the U.F.O.C. issued to Esposito’s Quincy office; (3) the franchise agreement Farazi signed in 2001 for its Worcester office; and (4) the March 2002 agreement amendment for Farazi’s Worcester office.[5] Based on these admissions, it is clear that Farazi’s cause of action has its origins in the legal documents drafted by Caffey, and therefore, the but-for test is satisfied.
Further, these activities, if proven, are sufficient to constitute the transaction of business under the Massachusetts longarm statute. Carlson Corp. v. University of Vermont, 380 Mass. 102, 105 (1980) (single visit to sign contract at issue is sufficient to constitute transaction of business); Good Hope Indus., Inc., 378 Mass. at 379 (telephone calls, mailings, and accepting checks drawn from Massachusetts bank account held to constitute transaction of business); Haddad, 32 Mass.App.Ct. 332, 335 (1992) (telephone calls and mailings from New York attorney constitutes transaction of business); Hahn v. Vermont Law School 698 F.2d 48, 52 (1st Cir. 1983) (mailing an application, information, and acceptance letter to plaintiff in Massachusetts constituted transacting business).[6]
In light of the prevailing case law, this court finds that the activities Caffey conducted on behalf of TCN fall within in the ambit of transacting business as contemplated by G.L.c. 223A, §3(a).[7]

III. Constitutional Requirements

Having concluded that the longarm statute permits jurisdiction over Caffey, this court must next determine if such exercise of jurisdiction comports with the due process requirements of the United States Constitution. Under due process considerations, Farazi must present sufficient evidence showing that Caffey had some minimum contact with the Commonwealth. See Tatro, 416 Mass. at 772-73. Minimum contacts are established by demonstrating that Caffey purposely availed himself of the privilege of conducting activities in the Commonwealth and that Farazi’s claim arises from, or relates to, Caffey’s activities within the forum. Id. at 772. Additionally, Farazi must establish that the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. Id. at 773.
Based on these circumstances, this court concludes that the activities Caffey conducted are sufficient to satisfy the minimum contacts standard. As noted above, Caffey conducted business on behalf of TCN by phoning and negotiating with Farazi, as well as sending him several letters, one of which gave rise to his wrongful franchise termination claim. Notwithstanding the agency relationship Caffey had as legal counsel for the corporate defendants, this court finds *501 that his activities were all purposefully directed towards Massachusetts and through them, he established an on-going business relationship with Farazi. See Hahn, 698 F.2d at 48. Furthermore, requiring Caffey to defend this action in court does not offend fair play and substantial justice. While this court recognizes that Caffey may be inconvenienced by litigation in this Commonwealth, the degree of hardship imposed does not rise to the level of a constitutional violation. Therefore, this court finds that the exercise of personal jurisdiction over Caffey is consistent with due process requirements under the Constitution.
Given the deficiencies in the factual record, this court believes that the dismissal of this case is premature. This court’s denial of the defendant’s Motion to Dismiss is based on the fact that the plaintiff has pointed to facts sufficient to warrant a finding of personal jurisdiction over Caffey at this stage of the litigation. This court orders that the stay on further discovery be lifted in order to develop a more complete record. This court recognizes that the personal jurisdiction issue may be raised again in a later motion depending on the outcome of discovery.

ORDER

For the foregoing reasons, the Defendant’s Motion to Dismiss is hereby DENIED. It is further ORDERED that the Stay Placed Upon Further Discovery be Removed.

Specifically, the booklet listed the following fees: [1] $395 scanning and placement fee ($200 for the franchise, $195 for the corporation); [2] $19.95 monthly maintenance fee; and (3) $395 optional photography package fee ($295 for the franchise, $100 for the photographer). Franchise Earnings Fees, eModel.com Booklet.

More specifically, Farazi alleges that Caffey drafted operative legal documents which contained misrepresentations, participated in a bait and switch scheme, transacted business as a director of the corporate defendants, and committed tortious injury in and outside of Massachusetts and engaged in a persistent course of conduct in Massachusetts sufficient to subject him to personal jurisdiction.

Caffey argues that the activities of the defendant within the forum state may not be used as a basis for personal jurisdiction if they were taken solely on behalf of a corporation. In support of his argument, Caffey relies on Zeidler v. A&W Restaurants, Inc. & Karen Long, a wrongful franchise termination federal action filed in the District of Illinois. Case No. 03-C-5063 (N.D.Ill. 2004). In Zeidler, the court declined to exercise personal jurisdiction over a non-resident in-house attorney for a restaurant franchisor on the basis of a single letter she sent to the plaintiff franchisee in Illinois and under the fiduciary shield doctrine. The fiduciary shield doctrine serves as a limitation on the reach of a longarm statute and prevents a court from asserting personal jurisdiction over a defendant based solely on his activities as a corporate representative. See Johnson Creative Arts v. Wool Masters, 573 F.Sup. 1106, 1111 (D.Mass. 1983), aff'd on other grounds, 743 F.2d 947 (1st Cir. 1984). This doctrine is based on the notion that is unfair to a corporate officer to find jurisdiction solely from contacts he had with the fomm state while acting on behalf of another. Id. Notwithstanding the factual dissimilarities, Zeidler is inapposite to this case because Massachusetts courts have never recognized the fiduciary shield doctrine as a limitation on the reach of the longarm statute. Johnson Creative Arts, Inc. 573 F.Sup. at 1111.

In the memorandum in support of his motion to dismiss, Caffey denies that he was ever involved in drafting the documents or that they were used by the corporate defendants.

In Hahn, the plaintiff, a Massachusetts resident, brought a breach of contract action against his alma mater, Vermont Law School (“VLS”), and one of its professors, a Vermont citizen. VLS was incorporated in Vermont, and its only place of business was in South Royalton, Vermont campus. Further, VLS never maintained any campus, office, bank account mailing address, or telephone listing in the Commonwealth of Massachusetts, nor [was] it licensed to do business there. Id. at 40. In fact, Hahn had first learned about VLS through a Boston Globe article, and at his request, the school him application information. Shortly thereafter, Hahn, applied to VLA and was accepted, and graduated three years later. In analyzing the personal jurisdiction issue, the First Circuit first looked to whether the assertion of personal jurisdiction over VLS was authorized by the state’s longarm statute. The key threshold question in Hahn arose under §3(a): did “VLS engage in any activity relating to Hahn’s decisions to apply and to attend the school that constituted the transaction of business.” Id. at 50. Construing the Massachusetts statute broadly, the First Circuit held that the “purposeful actions of VLS in mailing to Hahn in Massachusetts application information and an acceptance letter were sufficient, without more, to constitute transacting business.” Id at 51.

This court’s finding of personal jurisdiction under §3(a) of the longarm statute disposes of the need to address the other statutory bases for personal jurisdiction raised by the parties.